***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn, with modifications.
 *********** EVIDENTIARY RULING
Defendants have moved the Full Commission to allow into evidence the independent medical evaluation (IME) report prepared by Peter Silvain, Ph.D. The Full Commission finds that such motion was timely made prior to the close of the record. Thus, defendants' motion to allow Dr. Silvain's IME report into the record is GRANTED.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing and in and by pre-trial agreement:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between Gould 
Goodrich and the plaintiff at all relevant times herein.
3. Mid Atlantic Group provided Gould Goodrich with workers' compensation coverage at all relevant times herein.
4. Plaintiff's average weekly wage was $352.20 per week, yielding a compensation rate of $234.81 per week.
5. Plaintiff was last exposed to tanning chemicals during plaintiff's employment with Gould Goodrich, and specifically, plaintiff was exposed to such chemicals for thirty (30) days within a seven-month period, as set forth in N.C. Gen. Stat. § 97-57.
6. Gould Goodrich manufactures leather products such as gun holsters. In the manufacture of such items, leather undergoes chemical processing known as "tanning."
7. The onset of plaintiff's acute respiratory distress syndrome (ARDS) and related medical conditions was March 16, 2000. Plaintiff has been out of work continuously from March 16, 2000, to present.
8. The issues to be determined by the Commission are as follows:
 a. Whether plaintiff developed an occupational disease as a result of his employment with Gould Goodrich.
 b. If so, what, if any, benefits is plaintiff entitled to receive under the North Carolina Workers Compensation Act.
 ***********
Based upon the greater weight of the competent and credible evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff was 29 years old, having been born on July 25, 1972.
2. Plaintiff began employment with Gould Goodrich in 1993. He received no special training regarding any hazards associated with chemicals present in the work place.
3. Prior to his employment at Gould Goodrich, plaintiff had no significant history of any respiratory problems, seizures or chemical exposure. His health was very good and he had been regularly employed since high school.
4. Plaintiff's job duties with Gould Goodrich included dipping holsters into a black dye, putting screws into the holsters, filling glue pots, operating a riveting machine, working with glue, and cleaning glue off holsters. During his entire tenure with Gould Goodrich, plaintiff was regularly exposed to glue, glue cleaner, and black dye that contained trivalent chromium. Defendants' evidence to the contrary is not credible.
5. When cross-examined as to his testimony that plaintiff would only perform auxiliary job duties 2 to 3 hours a week, plant manager Bernard Gould admitted that he had no personal knowledge of how plaintiff spent his time at work. When cross-examined about the amount of time plaintiff specifically spent performing the dip-dyeing job activity, Mr. Gould admitted that his testimony was based on conversation with others and his knowledge of employees' basic assignments. However, plaintiff testified that he had been doing the dip-dyeing job for approximately a year before he got sick, and that they regularly switched him back and forth between job duties.
6. Contrary to the testimony of Mr. Gould that plaintiff would perform dyeing on rare occasions, Pamela Rucker, plaintiff's supervisor, testified that plaintiff had initially worked on line 3, where his primary job duty was dip-dyeing and that he had therefore been trained in dip-dyeing. Ms. Rucker further testified that plaintiff would sometimes leave his station on line 2 to take the holster parts to line 3 for dip-dyeing. Ms. Rucker testified that this would happen approximately once a week. Mr. Gould's testimony that plaintiff performed the dip-dyeing task less than one week total throughout his entire career is contrary to Ms. Rucker's testimony that dip-dyeing was plaintiff's primary job duty when he began with employer in 1995. Moreover, Ms. Rucker testified that one of the duties carried out on line 2 was edge dying. Edge dying was explained as a process where pieces of holsters were dyed with a one-inch foam brush. The dye was transferred from a 5-gallon bucket to a 1-gallon container and then poured into a cup. Ms. Rucker further testified that dip dying was only carried out on line 3.
7. After first working at the rivet machine, plaintiff testified that he was moved to the dip-dyeing station and to the chlorino cleaner station. Plaintiff also testified that he performed gluing activities, but was not specific as to how often. Plaintiff further testified that there was no breathing gear available when he was using the dip dye station or the glue. Plaintiff was dip-dyeing the week before he went to the hospital on March 16, 2000.
8. Gould Goodrich provided no protective breathing gear of any kind for any of the employees in its plant. Gould Goodrich did provide gloves and protective clothing for the employee who regularly operated the laminating station, where the glue contained toluene. The dip dye station had vacuum hoods over it.
9. At the beginning of his employment with Gould Goodrich, plaintiff spent at least a quarter of his time continuously working at the dip dye station. Over the entire 7 years that plaintiff worked for Gould Goodrich, he spent a significant amount of time at the dip dye station, using the glue dispenser, and using clarino cleaner to remove glue from the holsters. Defendants' evidence to the contrary is not credible. Additionally, defendants produced no evidence that the concentration of any hazardous material was so low that the use of protective breathing gear was not warranted.
10. For approximately two weeks prior to the incident of March 16, 2000, plaintiff felt a lack of energy, shortness of breath, and nasal congestion.
11. Shortly after reporting to his workstation on the morning of March 16, 2000, plaintiff developed an extremely severe headache, felt dizzy, and had shortness of breath. He was initially seen in a clinic, where he was given medication for his headache. Plaintiff suffered a seizure shortly thereafter while being driven by a friend. He was then transferred via ambulance to the Good Hope Hospital emergency room. Thereafter, plaintiff was transferred to UNC Hospitals, where he stayed for several weeks.
12. Since his release from UNC Hospitals following his initial attack, plaintiff has suffered several episodes of seizures and/or shortness of breath.
13. Plaintiff will no longer be able to perform the minimal tasks that he was once able to do. He needs help with his medications, as he does not remember when he should take his medication. Plaintiff also needs help in performing other daily activities. Additionally, as a result of his exposure to trivalent chromium while working for Gould 
Goodrich, plaintiff has a great sensitivity to everyday odors that he encounters, including cooking odors, car fumes, and other odors. Plaintiff's treating physicians have advised him that he is not to operate a motor vehicle because of the likelihood that he will have another seizure.
14. Since the plaintiff was initially released from the hospital at the end of March 2000, he has required constant care. Plaintiff currently resides with his sister, but his mother, Lily Thomas, cooks his meals because he cannot stand to be in the same house as his meal is prepared due to cooking odors. Either Mrs. Thomas or her husband, Charles Thomas, drives plaintiff to his doctor appointments. Mrs. Thomas spends five or six hours a day taking care of him. She cooks all of his meals, washes his clothes, and does his household cleaning and chores. Mr. Thomas shaves the plaintiff or takes him to a barber for shaving.
15. After the seizure and onset of plaintiff's illness in March of 2000, plaintiff can no longer think on his own. Plaintiff is constantly asking questions, and his speech is now slow and very slurred.
16. Plaintiff was referred to Dr. Marcia Dean Ford, a board certified toxicologist and specialist in emergency medicine, for the purpose of determining the cause of plaintiff's multiple medical conditions. Dr. Ford has rendered an opinion on this matter, and the Full Commission finds as fact, that plaintiff's occupational asthma and/or severe bronchospasm was caused by his exposure to trivalent chromium and/or other chemicals at Gould Goodrich, and that this occupational asthma led to hypoxic events, seizure disorder, and brain injury. Dr. Ford ruled out all other possible causes.
17. Defendants' arguments that Drs. Ford's and Logue's opinions should be given no weight because plaintiff told her he performed tanning at Gould and Goodrich is to no avail. In the pre-trial agreement signed by counsel for both parties prior to the hearing before the Deputy Commissioner, are the following stipulations:
 Defendant-Employer manufactures leather products such as gun holsters. In the manufacture of such items, the leather undergoes chemical processing known as `tanning.'
 Plaintiff was last exposed to the tanning chemicals during Plaintiff's employment with Defendant-Employer, and specifically, Plaintiff was exposed to said chemicals for thirty (30) days within a seven-month period, as required by N.C. Gen. Stat. § 97-57.
18. Plaintiff was seen by Dr. Patrick E. Logue, a board certified clinical neuropsychologist with Duke University Medical Center Department of Psychiatry, for the purpose of determining plaintiff's current neurocognitive state, and whether he is currently capable of performing any sort of vocational activity. Dr. Logue concluded, and the Full Commission finds as fact, that as a result of hypoxic brain injury, plaintiff is permanently and totally disabled from any sort of vocational activity.
19. The greater weight of the medical evidence establishes that plaintiff's chemical sensitivity, occupational asthma, ARDS, hypoxic brain injury, and neurocognitive deficiencies are due to causes and conditions characteristic of and peculiar to his employment with Gould 
Goodrich and are not ordinary diseases of life to which the general public is equally exposed. Plaintiff's employment with defendant employer was a significant and substantial contributing factor in the development of the above-stated conditions. Plaintiff's employment placed him at an increased risk of contracting such diseases. The above-listed conditions constitute an occupational disease under the Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
20. The greater weight of the evidence establishes that as a result of his compensable occupational disease, plaintiff has been completely unable to earn any wages since March 16, 2000. He is entitled to total disability compensation since that date.
21. Plaintiff has reached maximum medical improvement. The greater weight of the medical evidence is that plaintiff is incapable of any employment as a consequence of his compensable occupational disease. Plaintiff's total disability is permanent in light of the greater weight of the evidence. Defendants have failed to present evidence of any suitable employment plaintiff can obtain and keep, considering his unique characteristics.
22. Drs. Ford and Logue are of the opinion that plaintiff needs additional tests to determine the best method of treatment. They were also of the opinion that plaintiff will continue to need medical treatment for his condition caused by his employment.
23. The pneumonia suffered by plaintiff resulted from chemical exposure and was not bacterial in nature. The Full Commission finds the testimony of Dr. Ford to this effect to be credible. Dr. Ford testified: "Here is a guy who has these acute episodes, I mean, he's in really bad shape. He has pulmonary edema and yet by the time he s discharged 3 or 4 days later, his pulmonary functions are normal. This is not bacterial pneumonia. You just don t get better that quickly.
24. Exposure to trivalent chromium, which was contained in the black dye with which plaintiff worked, can be very irritating. Dr. Ford testified that trivalent chromium can "sensitize" and "cause the upper airway and mucosal, [the] lining of the mouth and nose, irritation. [Trivalent chromium] can, either with high enough exposure or low grade longer exposures, hypersensitize someone so that they can develop asthma." Dr. Ford referred to an article by Dr. Stewart Brooks, one of the country's experts on occupational asthma, and his discussion of trivalent chromium and the fact that it can be a sensitizer and can produce occupational asthma. Dr. Ford further explained that a patient can develop an asthma condition from exposure at a low level over a longer period of time.
25. After the second Material Safety Data Sheet (for the glue product) was introduced into evidence, Dr. Ford noted that both hexane and toluene exposure could potentially explain the headaches plaintiff was experiencing.
26. Defendants have submitted the IME report prepared by Peter Silvain, Ph.D., Clinical Associate Professor of Psychiatry at Georgetown University School of Medicine. Dr. Silvain reviewed plaintiff's records, as provided to him by defendants. Dr. Silvain opined that plaintiff's medical records lacked information regarding his premorbid mental functioning in which to make a comparison to plaintiff's current mental function. Additionally, Dr. Silvain stated, ". . . chromium-induced asthma may occur in some sensitized individuals exposed to elevated concentrations of chromium in air, but the number of sensitized individuals is low. . . ." Dr. Silvain ultimately concluded that plaintiff's condition could likely be the result of other factors unrelated to plaintiff's work environment. However, based on the totality of the evidence, the Full Commission affords greater weight to the testimonies of Drs. Ford and Logue, who treated plaintiff and were thus in a better position to causally relate plaintiff's work related exposure to the development of his medical condition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff developed an occupational disease as a result of his employment with Gould Goodrich. Plaintiff's chemical sensitivity, occupational asthma, ARDS, seizure disorder, hypoxic brain injury, and neurocognitive deficiencies are the compensable consequences of plaintiff's occupational disease. N.C. Gen. Stat. § 97-53(13); SeeBooker v. Medical Center, 297 N.C. 458, 468, 256 S.E.2d 189, 196 (1979).
2. Defendants are obligated to provide plaintiff such medical treatment as is reasonably required as a result of plaintiff's occupational disease to effect a cure, give relief, or lessen plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
3. As a result of his compensable occupational disease, plaintiff has been totally disabled since March 16, 2000. N.C. Gen. Stat. § 97-29.
4. Plaintiff is permanently and totally disabled. N.C. Gen. Stat. § 97-29.
5. As a result of his occupational disease, plaintiff is entitled to have defendant pay to him total and permanent disability compensation in the amount of $224.40 per week beginning March 16, 2000, and continuing for the remainder of plaintiff's life or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff total disability compensation in the amount of $224.40 per week beginning March 16, 2000, subject to the attorney's fees awarded below in paragraph 3, and continuing for the remainder of plaintiff's life or until further order of the Commission. All accrued benefits shall be paid in one lump sum.
2. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury for so long as such evaluations, treatments, and examinations may reasonably be required to effect a cure, give relief, and/or lessen plaintiff's period of disability.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation approved and awarded for plaintiff is approved and allowed for plaintiff's counsel. Defendants shall pay to plaintiff's counsel the attorney's fees due on the outstanding compensation in one lump sum. As to future compensation due plaintiff, defendants shall forward directly to plaintiff's counsel every fourth compensation check, which represents attorney's fees.
4. Defendants shall bear the costs of this proceeding.
This 3rd day of March 2003.
 S/____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER